# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESUS DELACRUZ,<br><br>                                    Petitioner,<br><br>v.<br><br>ROSEMARY NDOH, Warden,<br><br>                                    Respondent. | Case No.:  18cv2597 CAB (WVG)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY** |

## I.      INTRODUCTION

Petitioner Jesus Delacruz (Petitioner" or "Delacruz"), a state prisoner, has filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. §  2254, challenging his San Diego Superior Court conviction in case number SCD254058 for seven counts of committing lewd acts on a child under the age of 14.  (Pet. at 1, ECF No. 1 "Pet.")[1]  The Court has reviewed the Petition, the Answer and Memorandum of Points and Authorities in Support of the Answer, the Traverse and Memorandum of Points and Authorities in

/ / /

---

[1]  Page numbers for docketed materials cited in this Report and Recommendation refer to those imprinted by the court's electronic case filing system.

Support of the Traverse, the lodgments and all the supporting documents submitted by both parties.  For the reasons discussed below, the Court the Petition is **DENIED**.

## II.    FACTUAL BACKGROUND

This Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence.  *See* 28 U.S.C. § 2254(e)(1) (West 2006); *see also Parke v. Raley*, 506 U.S. 20, 35-36 (1992) (holding findings of historical fact, including inferences properly drawn from those facts, are entitled to statutory presumption of correctness). The following facts are taken from the California Court of Appeal opinion:

A. Prosecution Case

1. The Family

M.R. (Mother) lived in El Salvador when her daughters, J. and M., were born in 2005 and 2002, respectively.  Mother moved to the United States when J. was about seven months old, but the daughters remained in El Salvador in the care of their grandmother, S.M.

Mother met and married Delacruz in 2008.  They were living together when J. and M., along with their grandmother, came to the United States in 2010 to live with them.  Mother worked days as a housekeeper and Delacruz was a construction worker.

2. The First Reports of Molestation and the Investigation

On January 22, 2014, Vanessa Shaffer, a school counselor at the daughters' school, received a report of possible molestation of J.  [Footnote 2:  In the late afternoon of January 21, 2014, a teacher at J.'s school, received a visit from a woman who identified herself as J.'s grandmother and told the teacher she was there to report her suspicion that J. had been sexually abused.  The teacher could not verify that J. attended the school, but told the visitor she would take down the information and give it to someone who could find out.  The teacher reported the conversation to the counselor the next day.  J.'s grandmother denied she visited J.'s school.]  Shaffer called J. into her office, and asked J. if there was anything happening at home which made her feel uncomfortable, and J. said there was.  Shaffer asked J. how long it had been happening, and when it last happened.  J. told

her it had been going on for a year and that the last time was the previous Saturday. Shaffer contacted the child protective services department.

Maria Mosqueda, a child protective services worker employed with County of San Diego's Child Welfare Services (CWS), went to the school that same day to speak with J. After reassuring J. that she was not in trouble and was safe, Mosqueda showed J. a diagram of a woman's private areas and asked J. if anyone had touched her private parts. J. responded, "Yes, my stepfather," and said the incidents started when she was six years old, had occurred more than one time, and that the last time was about a week earlier. She described that Delacruz would ask her to sit on his lap, would start touching her legs and buttocks, and "went back and forth with his fingers" on her vagina, over her underwear. On one occasion, Delacruz kissed her on the mouth. Touching occurred when Mother was not home and J. did not feel safe when she was home alone with Delacruz. J. said the incidents sometimes occurred in the living room, but happened mainly in Delacruz's bedroom. Delacruz told J. that if she said anything to Mother, he and Mother would separate. [Footnote 3: Mosqueda also spoke with M. at the school. M. told Mosqueda that a long time ago, Delacruz touched her vagina, under her underwear, one or two times, but M. never told her mother because M. was afraid Mother and Delacruz would separate.]

J. indicated she eventually told her grandmother. J. and M. and Mother talked about it together, and Mother promised to protect them and it would never happen again. Mother talked to Delacruz and he did stop for a few months, but then resumed touching her. J. did not again talk to Mother about the abuse.

After interviewing J., Mosqueda contacted law enforcement. Mosqueda also did not feel safe sending J. home with Delacruz still in the house, so Mosqueda contacted Mother to meet with Mosqueda at the school. Mosqueda told Mother of J.'s allegations and explained they needed a plan to keep J. safe. Mother admitted she first learned of the abuse from her own mother in September or October of 2013 and confronted Delacruz about it. Mosqueda telephoned Delacruz that same day and asked if he was willing to move out of the house until the investigation was complete, and Delacruz agreed to move out.

On February 7 the girls were interviewed separately by Marison Olguin, a forensic interviewer with the Chadwick Center at Rady Children's Hospital. [Footnote 4: Mosqueda, along with Detective Maggie Gibbons,

18cv2597 CAB (WVG)

observed the interviews via two way mirror from another room.] In J.'s interview she told Olguin she lived with Mother and her sister and that Delacruz used to live with her but he left because "[h]e did stuff I didn't like" and, when asked to elaborate, J. said Delacruz would call her into his room and then touch her with his hand "where we go pee" and on her buttocks. This happened more than one time. Olguin asked J. when it started, and J. said she was six or seven years old and living in another house on 50th Street. [Footnote 5: The family lived in an apartment on 50th Street in San Diego before moving to their current residence on 39th Street in SanDiego.] On that occasion, Mother was working (but M. was home) and Delacruz only touched J.'s buttocks.

When asked about the most recent event, J. said she did not remember that time very well, but on further probing by Olguin, said she was in the living room, M. was in the kitchen washing dishes, and Mother was at work. Delacruz was sitting on the large couch when he summoned her over. She complied and Delacruz started touching her.

Olguin asked whether, while they lived on 50th Street, Delacruz touched her one time or more than one time, and J. said he touched her more than one time. J. gave the same answer when asked about incidents occurring when they lived on 39th Street. Olguin also asked whether Delacruz ever touched her "not on top of your clothes?" and J. said that on one occasion Delacruz called her into his room, tried to pull her pants down, and started touching her. He touched both her buttocks and vaginal area. She grabbed her underwear to prevent him from pulling them down, told him to stop, and Delacruz did stop. J. said that, in each house, Delacruz touched her more than once under her clothing.

Olguin asked if Delacruz ever mention whether J. should tell anybody about what was happening. J. responded that Delacruz told her that, if J. did not want Mother and Delacruz to separate, J. should not tell Mother. J. added, "[W]ell they've now separated and I now feel more comfortable at the house that he now doesn't, he doesn't do that to me anymore." J. also indicated that at one point she did talk to Mother, who said she would speak to Delacruz. Thereafter, some months went by without any incidents, but then the touching resumed.

Olguin spoke to M. after interviewing J. M. said that when she was ten or eleven years old, Delacruz asked the girls if anyone had touched them, then put his hand "like that." [Footnote 6: M., describing what Delacruz

did, said he put his hand on her private part, looked at her, and asked her, "Did anybody do this to you?" M. responded, "No." M. was in Delacruz's bedroom and was sitting on the bed with J. and Delacruz. The touching was under her clothes and underwear. Delacruz asked the girls if anyone had touched them, looked at M., touched her, and asked her again, but M. told him no one had touched her.] Mother learned about the touching and talked to Delacruz, and Delacruz apologized to the girls and said he did not mean to hurt them. This happened when they lived in another house.

3. The Challenged Admissions by Delacruz

On February 12 Mosqueda again phoned Delacruz and asked if he would come to her office to talk with her. Delacruz agreed and they made an appointment for the following day. Mosqueda then contacted Detective Maggie Gibbons, the lead investigator, to let her know the status of the CWS investigation. Detective Gibbons said she would be coming to the CWS office to arrest Delacruz, but would first give Mosqueda the opportunity to complete her interview.

When Delacruz arrived at the CWS office, he checked in at the reception desk. [Footnote 7: Detective Gibbons arrived before Delacruz and was waiting in another room to arrest him once Mosqueda finished her interview.] Mosqueda greeted him and escorted him to a private conference room. She told Delacruz she was the social worker for his daughters, that Delacruz had the right not to talk to her, and could decline to answer any questions which made him feel uncomfortable. After asking for some general background information, Mosqueda asked if Delacruz knew why he was there, and Delacruz replied "Yes."

Mosqueda told Delacruz she wanted to talk to him about the allegations. Delacruz responded, "I know I did wrong. It was an error." When Mosqueda asked Delacruz what he meant, he replied "Because I touched [J.] . . . in her vagina." Delacruz said he touched J. about four or five times over her clothes, and about two or three times under her clothes, but then said he did not remember the number of times. The first time was when they lived on 50th Street, but most occasions were at their 39th Street residence. He said he was afraid that children at school might be touching J. Mosqueda asked whether Mother confronted him about the touching. Delacruz said Mother did but he explained to her it was "for educational purposes." He stopped touching J. after being confronted by Mother but then started up again.

5

After Mosqueda finished talking to Delacruz, she gave Detective Gibbons the statement she obtained from Delacruz, as well as other statements she obtained concerning the investigation. The CWS case remained open and Mosqueda continued to provide services to the girls.

### 4. Victims' Trial Testimony

At trial J. testified she loved Delacruz, and she and Mother were sad when he had to move out, and she wanted Mother and Delacruz to reunite. She testified Delacruz had touched her vagina and buttocks on more than one occasion in a way that made her uncomfortable, and had kissed her on her cheeks and lips. However, she denied that he touched her when the family lived at the 50th Street residence, and had only touched her when she was eight. She also denied Delacruz had touched her under her clothing or tried to pull her pants off, and denied Delacruz had warned her not to tell Mother. She also denied he kissed her while touching her, but only kissed her when dropping her off at school or to say good night. She also testified that, after she, M. and Mother had talked to Delacruz about the touching, he apologized and never resumed touching her.

M. testified that when the family was living at the 50th Street address, Delacruz asked M. and J. to come into his bedroom, and all three sat on the bed. Delacruz touched M.'s vagina under her clothing but over her underwear, and he also touched J. by putting his hand underneath her pants. Delacruz later apologized. M. did not recall Delacruz touching her underneath her underwear.

### 5. The Defense

Testifying at trial, Delacruz admitted he touched the girls' vaginas, but said he did so only one time. He denied telling Mosqueda that he touched them on multiple occasions. Moreover, he testified he touched them only in connection with his effort to find out if they were being sexually abused at school. He claimed to have heard a rumor that an employee at J.'s school had been acting inappropriately with the students. After he noticed a change in J.'s behavior and demeanor, he became concerned someone at the school might be sexually abusing her. Based on this concern, Delacruz called J. and M. into the living room and asked them "has someone ever touched you like this?" and then placed his hand on the girls' vaginas. Delacruz said he was not feeling sexual, did not have an erection, and was not trying to make the girls feel sexual.

6

The family later discussed what had occurred. Mother explained that in the future, she need [sic] to be present for these types of conversations. Delacruz agreed and apologized if he made the girls feel uncomfortable. Delacruz never touched them in the bedroom and never told J. not to discuss the incident with Mother.

The defense also offered evidence of Delacruz's good character and lack of abnormal or sexual behavior toward children. Delacruz's two nephews and his two sisters testified he did not have a character that would have allowed him to harm children and they had never seen him act abnormally toward children.

(Lodgment No. 6 at 3-10, ECF No. 10-10.)

## III.  PROCEDURAL BACKGROUND

On November 5, 2015, the San Diego District Attorney's Office filed an amended information charging Delacruz with seven counts of committing lewd acts on a child under the age of 14 (Cal. Penal Code § 288(a)).  (Lodgment No. 1, Clerk's Tr. vol. 1 at 119-20, ECF No. 10-5.)  Counts one through six involved Petitioner's conduct with J. and count seven involved his conduct with M.[2]  (*Id.* at 120-23.)

As to counts one through four and seven, it was also alleged that Delacruz had substantial sexual conduct with a child under age 14 (Cal. Penal Code § 1203.066(a)(8)). (*Id.* at 120-23.)  It was further alleged that Petitioner committed the offenses against more than one victim and had substantial sexual conduct with a victim under 14 years of age (Cal. Penal Code §§ 667.61(b), (c) & (e), 2103.066(a)(7)).  (*Id.*)

Jury trial began on November 16, 2015.  (Lodgment No. 2, Clerk's Tr. vol. 2 at 167, ECF No. 10-6.)  On November 24, 2015, the jury found Delcruz guilty on all counts and found all special allegations to be true.  (*Id.* at 179-92, *see also* Lodgment No. 1, Rep.'s Tr. vol. 4 at 187-94, ECF No. 10-4.)  On February 26, 2016, the court sentenced Delacruz to an indeterminate term of fifteen-years-to life in prison.  (Lodgment No. 2,

---

[2] As did the California Court of Appeal, this Court refers to the minor victims by the first initial of their first names – "J." and "M."  During the state court proceedings, "M." was also frequently referred to by her middle name, which begins with an "A."  (*See* Lodgment No. 1, Rep.'s Tr. vol. 3 at 74, 101-02.)

Clerk's Tr. vol. 2 at 195-96, ECF No. 10-6, *see also* Lodgment No. 1, Rep.'s Tr. vol. 4 at 247-52, ECF No. 10-4.)

Delacruz appealed his conviction to the California Court of Appeal. (*See* Lodgment No. 3, ECF No. 10-7.) He argued his conviction should be reversed because (1) his statements to a social worker were admitted at trial in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966) and the Due Process Clause, and (2) his Sixth Amendment right to confrontation and cross-examination were violated when the trial court improperly admitted expert testimony. (*See* Lodgment No. 3, ECF No. 10-7.) On August 15, 2017, the appellate court affirmed Delacruz's conviction in a reasoned opinion. (Lodgment No. 6 at 31, ECF No. 10-10.)

Delacruz filed a petition for review in the California Supreme Court on September 8, 2017, raising the same claims he presented to the appellate court. (*See* Lodgment No. 7, ECF No. 10-11.) The court denied the petition on November 15, 2017, without comment or citation. (*See* Lodgment No. 8, ECF No. 10-12.)

On November 14, 2018, Delacruz filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 in this Court. (*See* Pet., ECF No. 1.) On February 27, 2017, Respondent filed an Answer, Memorandum of Points and Authorities in Support of the Answer, and Lodgments of the state court records. (*See* ECF Nos. 8, 10.) Delacruz filed a Traverse and Memorandum of Points and Authorities in Support of the Traverse on April 27, 2019. (*See* ECF No. 13.)

## IV.  SCOPE OF REVIEW

Delacruz's Petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320 (1997). Under AEDPA, a habeas petition will not be granted unless the adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. 28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 8 (2002).

A federal court is not called upon to decide whether it agrees with the state court's determination; rather, the court applies an extraordinarily deferential review, inquiring only whether the state court's decision was objectively unreasonable. *See Yarborough v. Gentry*, 540 U.S. 1, 4 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004). In order to grant relief under § 2254(d)(2), a federal court "must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *See Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004).

A federal habeas court may grant relief under the "contrary to" clause if the state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Bell v. Cone*, 535 U.S. 685, 694 (2002). The court may grant relief under the "unreasonable application" clause if the state court correctly identified the governing legal principle from Supreme Court decisions but unreasonably applied those decisions to the facts of a particular case. *Id.* Additionally, the "unreasonable application" clause requires that the state court decision be more than incorrect or erroneous; to warrant habeas relief, the state court's application of clearly established federal law must be "objectively unreasonable." *See Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams v. Taylor*, 529 U.S. 362, 411 (2000). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

/ / /

/ / /

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision and presumes it provides the basis for the higher court's denial of a claim or claims. *See Ylst v. Nunnemaker*, 501 U.S. 797, 805-06 (1991). If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by *Andrade*, 538 U.S. at 75-76); *accord Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). However, a state court need not cite Supreme Court precedent when resolving a habeas corpus claim. *See Early*, 537 U.S. at 8. "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" *id.*, the state court decision will not be "contrary to" clearly established federal law. *Id.* Clearly established federal law, for purposes of § 2254(d), means "the governing principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Andrade*, 538 U.S. at 72.

## V.   DISCUSSION

In his Petition, Delacruz raises two grounds for relief. In claim one, he argues his statements to a social worker were improperly admitted into evidence at trial, in violation of his Fifth and Fourteenth Amendment rights. (Pet. at 5-8, ECF No. 1; *see also* Mem. P. & A. Supp. Traverse at 11-21, ECF No. 13-1.)   In claim two, Delacruz claims expert testimony was improperly admitted, in violation of his Sixth Amendment rights. (Pet. 10-12, ECF No. 1; *see also* Mem. P. & A. Supp. Traverse at 21-24, ECF No. 8-1.) Respondent argues the state court's denial of Delacruz's claims was neither contrary to, nor an unreasonable application of, clearly established law. (*See* Mem. P. & A. Supp. Answer at 16-36, ECF No. 8-1.)

### A.   Statements to Social Worker

In ground one, Delacruz argues that his statements during an interview with social worker Maria Mosqueda were erroneously introduced at trial for two reasons. First, he

contends the statements were obtained violation of his *Miranda* rights and as such should have been excluded at trial. (*See* Pet. at 5-10, ECF No. 1; *see also* Mem. P. & A. Supp. Traverse at 11-15.) Second, he asserts his statements to Mosqueda were inadmissible because they were involuntary under the Fourteenth Amendment's Due Process Clause. (Pet. at 5-10, ECF No. 1; *see also* Mem. P. & A. Supp. Traverse at 15-20.)

### 1. Factual Background

As noted above, Delacruz raised both the *Miranda* and due process claims presented in ground one in his petition for review to the California Supreme Court. (*See* Lodgment No. 7 at 30-45, ECF No. 10-12.) The court denied the petition without comment or citation. (Lodgment No. 8, ECF No. 10-13.) As such, this Court looks through to the last reasoned state court opinion, that of the California Court of Appeal. *See Ylst*, 501 U.S. at 805-06. The appellate court summarized the relevant proceedings and the underlying facts related to the claims, as follows:

> Delacruz contends the admission he made during his February 13 interview with CWS worker Moqueda [was] erroneously admitted into evidence because those statements were obtained in violation of *Miranda* or made involuntary.

> Delacruz moved in limine to exclude statements he made to Mosqueda on the grounds he was not given *Miranda* warnings before the interview began. He argued that Mosqueda was acting as an agent of the police and conducted a custodial interrogation while Delacruz was in constructive custody such that Miranda warnings were required. The prosecution opposed the motion, contending that social workers are not members of law enforcement and therefore need not provide *Miranda* warnings, and that Delacruz was not in custody but instead voluntarily attended the interview in Mosqueda's office. The court granted Delacruz's request for an Evidence Code section 402 hearing, stating that it needed to take testimony before it could rule on the issue.

> At the evidentiary hearing, Mosqueda testified she is a Child Protective Services worker with CWS and does not work for the police department.

/ / /

In 2014 she was assigned to follow up on J. and M.'s allegations of sexual abuse. Mosqueda first spoke to the girls. After they confirmed there was sexual abuse, she spoke to their mother and then to Delacruz. Her first contact with Delacruz was a telephone call in which she informed him about the investigation and asked if he was willing to leave the house. He agreed to leave.

The second call, the day before their interview, was to ask if he would agree to meet with her at her office to discuss the investigation. Delacruz agreed to this request as well. Mosqueda never told Delacruz the meeting was mandatory, or that he would be arrested or suffer other consequences if he refused to meet with her. [Footnote 8: At the time Mosqueda asked Delacruz to be interviewed, he had moved out and was not living with his wife or children. Mosqueda believed Delacruz knew his future access to the children might be affected by the results of Mosqueda's investigation which included the interview.] Mosqueda knew Detective Gibbons (with whom Mosqueda had previously spoken) intended to arrest Delacruz after the interview, but she did not share that information with Delacruz. After making the appointment with Delacruz, Mosqueda informed Gibbons by email that Delacruz was coming to her office. Gibbons's email reply indicated Mosqueda could conduct the interview but that, once the interview was over, Gibbons intended to arrest Delacruz.

On the day of the interview, after Delacruz checked in with the CWS receptionist, Mosqueda came out to greet him and led him to a conference room. [Footnote 9: Gibbons arrived at Mosqueda's office before Delacruz, and the two women spoke about Gibbons's plan to arrest Delacruz. They decided Gibbons would stay "out-of-sight" until the interview was over so that Gibbons's presence did not "scare" or "spook" him. Detective Gibbons waited in an empty conference room around the corner during the interview.] Following standard practice for privacy reasons and Delacruz's protection, Mosqueda closed the door and locked it. She introduced herself, told Delacruz she worked for CWS, and explained he had the right not to answer a question if it made him feel uncomfortable. She also told him that if he did not want to continue with the investigation, he should say so and she would end the interview. Before starting the interview, Mosqueda also provided Delacruz with a pamphlet informing him of his rights as an alleged perpetrator in a CWS investigation. The conversation was conducted in Spanish and was casual and open-ended. During their discussion, Delacruz said he knew he was there because of J.'s allegation of sexual abuse.

Mosqueda's practice was that she sometimes notifies law enforcement when she interviews a child or a nonoffending parent, and always does so when she interviews the alleged perpetrator. If a detective is assigned to the case, she tries to make contact with the detective and, if she does not know who the detective is, she contacts the child abuse unit within the San Diego Police Department. This was the first time in Mosqueda's experience that a police officer ever came to her office and waited for the completion of an interview with a suspect to make an arrest.

When the interview was over, Mosqueda told Delacruz that law enforcement was in the other room and he needed to come with her. Mosqueda and a coworker then walked with Delacruz to the location where Gibbons was waiting. Delacruz and Gibbons then left the CWS offices.

Mosqueda subsequently typed out Delacruz's statement from notes she took during the interview and faxed it to Gibbons. Mosqueda had not agreed in advance to give Gibbons the statement. Gibbons either asked for it when she arrested Delacruz, or called Mosqueda later and asked for it. Mosqueda also provided Gibbons with the statements she took from the J., M., and Mother.

After noting it found Mosqueda's testimony credible, the court concluded she was acting in her capacity as a social worker and not as an agent of the police when she conducted the interview. It further determined that Delacruz was not in custody when he was interviewed, and that the surrounding circumstances showed there was no coercion in connection with the interview. Accordingly, the court ruled that *Miranda* warnings were not required and the statements were admissible.

(Lodgment No. 6 at 13-16, ECF No. 7-10.)

    *2.*    *Miranda*

The California Court of Appeal went on to analyze the *Miranda* aspect of Delacruz's claim, stating:

Under *Miranda*, "[b]efore being subjected to 'custodial interrogation,' a suspect 'must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.' [Citation.] Statements elicited in violation of this rule are

generally inadmissible in a criminal trial. [Citations.]" (*People v. Mayfield* (1997) 14 Cal.4th 668, 732, 60 Cal.Rptr.2d 1, 928 P.2d 485.) The procedural safeguards of *Miranda* ". . . come into play only where 'custodial interrogation' is involved, and by 'custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" (*People v. Fiorrito* (1968) 68 Cal.2d 718, 718 [quoting *Miranda*, *supra*, 384 U.S. at p. 444, 86 S.Ct. 1602].) The raison d'etre of *Miranda* is to "preserve the [Fifth Amendment] privilege during 'incommunicado interrogation of individuals in a police-dominated atmosphere' [(*Miranda*, at p. 445, 86 S.Ct. 1602)] [because] [t]hat atmosphere is said to generate 'inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.' [(*Id*. at p. 467, 86 S.Ct. 1602.)]" (*Illinois v. Perkins* (1990) 496 U.S. 292, 296, 110 S.Ct. 2394, 110 L.Ed.2d 243 (*Perkins*).) Indeed, because "[i]t is the premise of *Miranda* that the danger of coercion results from the interaction of custody and official interrogation" (*id*. at p. 297, 110 S.Ct. 2394, emphasis added), and "'[f]idelity to the doctrine announced in *Miranda* requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated'" (*id*. at p. 296, 110 S.Ct. 2394, quoting *Berkemer v. McCarty* (1984) 468 U.S. 420, 437, 104 S.Ct. 3138, 82 L.Ed.2d 317), the doctrine has not been applied when one or the other components is absent. (*Perkins*, at pp. 297–300, 110 S.Ct. 2394 [defendant in custody was questioned by person who lacked indicia of law enforcement authority; held "an undercover law enforcement officer posing as a fellow inmate need not give *Miranda* warnings to an incarcerated suspect before asking questions that may elicit an incriminating response"].)

Thus, statements obtained as the result of questions posed by non-law enforcement officers (even to persons clearly "in custody") are admissible notwithstanding the absence of *Miranda* warnings. (*See*, e.g., *People v. Leonard* (2007) 40 Cal.4th 1370, 1401–1402, 58 Cal.Rptr.3d 368, 157 P.3d 973 [defendant was in police custody but voluntarily spoke to father; no *Miranda* violation because "[a] defendant's 'conversations with his own visitors are not the constitutional equivalent of police interrogation'"]; *People v. Guilmette* (1991) 1 Cal.App.4th 1534, 1539–1540, 2 Cal.Rptr.2d 750 [defendant in police custody but defendant voluntarily spoke to civilian who was secretly cooperating with police]; *People v. Davis* (2005) 36 Cal.4th 510, 555, 31 Cal.Rptr.3d 96, 115 P.3d

417 [defendant in police custody but voluntarily spoke to cellmates; held: no *Miranda* violation because "[v]iewing the situation from defendant's perspective, [ ] when he made these statements to his cellmates there was no longer a coercive, police-dominated atmosphere, and no official compulsion for him to speak"].) Conversely, questions posed to persons who are not "in custody," even if posed by law enforcement officers, likewise need not be preceded by *Miranda* warnings. (*People v. Thomas* (2011) 51 Cal.4th 449, 475–478, 121 Cal.Rptr.3d 521, 247 P.3d 886; *People v. Stansbury* (1995) 9 Cal.4th 824, 830–834, 38 Cal.Rptr.2d 394, 889 P.2d 588 [also noting an officer's subjective views or beliefs not germane to issue of custody unless "'manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave'"].)

With those precepts in mind, we conclude the trial court correctly rejected Delacruz's claim that his statements were obtained in violation of *Miranda*. [Footnote 10 omitted.] First, the questions were not posed to Delacruz by a law enforcement officer. Mosqueda's testimony supports the conclusion that her interview was in proper discharge of her duties as a protection services worker for CWS, there is no evidence she interviewed Delacruz at the direction of any police officer, and there is no basis to conclude Delacruz would have perceived Mosqueda's interview of him at the CWS offices as a fulfillment of Mosqueda's law enforcement role. Indeed, courts in other jurisdictions "have consistently held an alleged child abuser is not entitled to *Miranda* warnings from a social worker in a non-custodial setting." (*United States v. Robles* (U.S.A.F. Ct. of Crim. Apps. 2000) 53 M.J. 783, 790 [citing numerous cases].)

California cases have similarly concluded that investigatorial questions by persons whose primary duties fall outside law enforcement are not required to be preceded by *Miranda* warnings. Thus, in *People v. Salinas* (1982) 131 Cal.App.3d 925, 182 Cal.Rptr. 683 (*Salinas*), a mother was arrested for child abuse while she was visiting a hospital, and a doctor requested to interview her. (*Id*. at p. 937, 182 Cal.Rptr. 683.) The interview was conducted in a small private room, with police officers present and the mother then in custody. The doctor sought a medical history of the child's injuries, which elicited statements subsequently admitted against her at trial. (*Id*. at pp. 936–938, 941, 182 Cal.Rptr. 683.) The *Salinas* court held the statements were properly admitted notwithstanding the absence of *Miranda* warnings, concluding the doctor was not an agent of law enforcement (even though he was under a statutory

duty to report evidence of child abuse to the police) because his medical interview was part of regular hospital procedure and was intended to obtain information to allow him to fulfill his medical duties. (*Id*. at pp. 938–943, 182 Cal.Rptr. 683.)

Moreover, even where the questions are posed by governmental employees, the courts have concluded such questioning need not be preceded by *Miranda* warnings when the primary duties of the governmental employee fall outside law enforcement. For example, in *People v. Wright* (1967) 249 Cal.App.2d 692, 57 Cal.Rptr. 781, a parking lot security guard employed by a county hospital detained the defendant, who had burglarized a car in the parking lot, and questioned him without first giving *Miranda* warnings. The *Wright* court held the defendant's statements to the security guard were admissible because the security guard was not employed by a governmental agency whose primary mission was to enforce the law. (*Id*. at pp. 693–695, 57 Cal.Rptr. 781.)

Here, Mosqueda was not a member of law enforcement. Instead, from Delacruz's perspective (*Perkins*, *supra*, 496 U.S. at p. 296, 110 S.Ct. 2394 [*Miranda* is concerned with coercive impacts and "[c]oercion is determined from the perspective of the suspect"]), Mosqueda's primary purpose as a CWS worker was (as in *Salinas*) to gather information to fulfill her non-law enforcement purposes rather than to further a criminal prosecution. [Footnote 11 omitted.] Although Mosqueda ultimately provided Delacruz's statement to police, that fact does not implicate the concerns of *Miranda* of the coercive impact created by the confluence of official interrogation while in a custodial setting. (*Perkins*, at p. 297, 110 S.Ct. 2394 ["We reject the argument that *Miranda* warnings are required whenever a suspect is in custody in a technical sense and converses with someone who happens to be a government agent . . . . [W]here a suspect does not know that he is conversing with a government agent, these pressures do not exist"].)

Moreover, we are also satisfied Mosqueda's questions were posed in a noncustodial setting. Delacruz was not arrested until after he had completed his interview, and "[w]hen there has been no formal arrest, the custody issue turns on 'how a reasonable person in the suspect's position would perceive his circumstances.'" (*People v. Macklem* (2007) 149 Cal.App.4th 674, 689, 57 Cal.Rptr.3d 237.) When assessing whether a reasonable person would have perceived him or herself to have been in custody, courts consider such factors as who initiated the contact and (if

initiated by law enforcement) whether the person voluntarily agreed to the interview; where the interview took place; whether the person was informed he or she was under arrest or whether they informed the person that he or she was free to terminate the interview and leave at any time; whether the person's freedom of movement during the interview was restricted; how long the interrogation lasted; how many interrogators participated; whether interrogators were aggressive, confrontational, and/or accusatory; and whether the person was arrested at the end of the interrogation. (*People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1162, 59 Cal.Rptr.2d 587.)  "No one factor is dispositive.  Rather, we look at the interplay and combined effect of all the circumstances to determine whether on balance they created a coercive atmosphere such that a reasonable person would have experienced a restraint tantamount to an arrest." (*Ibid*.)

Delacruz asserts he was in custody when he entered the room with Mosqueda because "it had already been decided . . . he was going to be arrested at the end of the interview. . .."  However, there was no evidence Delacruz was aware law enforcement was present, much less that he was aware of their intent to arrest him.  As the court in *People v. Stansbury*, supra, 9 Cal.4th 824, 38 Cal.Rptr.2d 394, 889 P.2d 588 explained, "'[a]n officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned.'  [Quoting *Stansbury v. California* (1994) 511 U.S. 318, 325, 114 S.Ct. 1526, 128 L.Ed.2d 293, italics added.]  Thus, evidence of the officer's subjective suspicions or beliefs is relevant only 'if the officer's views or beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave'. . . ." (*People v. Stansbury*, *supra*, 9 Cal.4th at p. 830, 38 Cal.Rptr.2d 394, 889 P.2d 588.)  The determination of whether a reasonable person in defendant's position would have felt he or she was in custody is assessed by "[d]isregarding the uncommunicated subjective impressions of the police regarding defendant's custodial status as irrelevant" (*ibid*.) because "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." (*Berkemer v. McCarty* (1984) 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317.)  Accordingly, Delacruz's custodial status during the interview must be assessed without regard to any uncommunicated intent to arrest Delacruz after his interview.

/ / /

/ / /

We thus focus on the circumstances of which Delacruz was aware. While Mosqueda initiated the contact, Delacruz voluntarily agreed to the interview and made his own way to the CWS offices. After he checked in with the receptionist, Mosqueda greeted him and led him to a conference room. Although Mosqueda closed the door and locked it, she testified it was locked for privacy reasons and Delacruz's protection, and was apparently locked from the inside to keep people out rather than to keep Delacruz in. She then told him he had the right not to answer a question if it made him feel uncomfortable and, if he did not want to continue, he should say so and she would end the interview and he could leave. She was the lone questioner, and possessed neither handcuffs nor a weapon, and she never told him he could not leave. She described the conversation as "casual" and "open-ended," and there is no suggestion the interview was lengthy. [Footnote 12: Delacruz asserts on appeal this was "indisputably an 'interrogation'" because Mosqueda subjected him to "extensive questioning" regarding the allegations. While the length of the questioning can be a relevant factor for some purposes (see, e.g., *People v. Stewart* (1965) 62 Cal.2d 571, 579), the evidence at the Evidence Code section 402 hearing was silent on the length of the interview, and Delacruz['s] trial testimony was that it lasted only 10 minutes.] Finally, while law enforcement did intend to arrest Delacruz after the interview, a reasonable person in Delacruz's position would not have known during the interview that he or she was not free to leave after the interview, because it was only after Mosqueda finished interviewing Delacruz that she revealed law enforcement was waiting for him.

Under analogous circumstances, courts have concluded the defendant was not in custody during questioning. For example, in *Green v. Superior Court* (1985) 40 Cal.3d 126, 219 Cal.Rptr. 186, 707 P.2d 248, the defendant voluntarily accompanied officers to the station for an interview. The defendant was not told he was under arrest, but was instead told he could leave if he wanted to. The officers questioned him in a locked room at the police station, although there was no evidence the defendant knew it was locked, and the interview was lengthy (more than two hours) and detailed but not accusatory in nature. The Supreme Court concluded that under these circumstances a reasonable person would not have felt in custody during the interview. (*Id.* at pp. 131–135, 219 Cal.Rptr. 186, 707 P.2d 248.) Here, there was even less indicia from which a reasonable person would have perceived he was in custody. The lone questioner was not law enforcement, and it took place at a more benign location than a police station. (See *People v. Morris* (1991) 53 Cal.3d 152, 198, 279

Cal.Rptr. 720, 807 P.2d 949 (disapproved on other grounds in *People v. Stansbury*, *supra*, 9 Cal.4th 824, 830, fn. 1, 38 Cal.Rptr.2d 394, 889 P.2d 588) [*Miranda* warnings not required where police questioning was brief and nonaccusatorial; inquiry did not take place in jail or on police premises and was unaccompanied by traditional indicia of arrest].) In light of all the circumstances of which Delacruz was aware, we conclude a reasonable person would not have perceived they were in custody at the time of the interview. Accordingly, there was no need to provide *Miranda* warnings because the interview did not constitute "questioning initiated by law enforcement officers after a person has been taken into custody." (*Miranda*, supra, 384 U.S. at p. 444, 86 S.Ct. 1602.)

(Lodgment No. 6 at 13-22, ECF No. 10-10.)

The Fifth Amendment right against self-incrimination requires the exclusion of statements elicited in a custodial interrogation unless the suspect was first issued warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966). *Miranda* and its progeny govern the admissibility of statements made during custodial interrogation in both state and federal courts. *See id*. The requirements of *Miranda* are "clearly established" federal law for purposes of federal habeas corpus review under 28 U.S.C. § 2254(d). *Juan H. v. Allen*, 408 F.3d 1262, 1271 (9th Cir. 2005); *Jackson v. Giurbino*, 364 F.3d 1002, 1009 (9th Cir. 2004).

*Miranda* safeguards are required when a suspect is (1) "in custody" and (2) subject to "interrogation" by the government. *Miranda*, 384 U.S. at 444. A suspect is in custody when "there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam)). An "interrogation" includes both express questioning and its "functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). This includes any words or actions that an officer could reasonably have foreseen would "elicit an incriminating response." *Id.*; *see also Pennsylvania v. Muniz*, 496 U.S. 582, 600-01 (1990) (plurality opinion).

Respondent argues Delacruz is not entitled to habeas relief because he was not "in custody" during the interview with Mosqueda. (*See* P. & A. Supp. Traverse at 12-15,

ECF No. 13-1.)  When a suspect has not formally been taken into police custody, a suspect is nevertheless considered "in custody" for purposes of *Miranda* if the suspect has been "deprived of his freedom of action in any significant way."  *Miranda*, 384 U.S. at 444.  To determine whether the suspect was in custody, courts must first examine the totality of the circumstances surrounding the interrogation.  *See Thompson v. Keohane*, 516 U.S. 99, 112 (1995).  Then the court must ask whether a reasonable person in those circumstances would "have felt he or she was not at liberty to terminate the interrogation and leave."  *Id.*; *see also Berkemer v. McCarty*, 468 U.S. 420, 442 & n. 35 (1984).

The Ninth Circuit has set forth the following non-exhaustive list of factors that are particularly relevant to the custody inquiry:  "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual."  *United States v. Kim*, 292 F.3d 969, 973 (9th Cir. 2001) (quoting *United States v. Hayden*, 260 F.3d 1062, 1066 (9th Cir. 2001)) (internal quotation marks omitted).  Other factors may also be "pertinent to, and even dispositive of, the ultimate determination whether a reasonable person would have believed he could freely walk away from the interrogators."  *Kim*, 292 F.3d at 974. Further, the Ninth Circuit has held that the "benchmark for custodial interrogations in locations outside of the police station" is whether or not the interrogation occurred in a "police-dominated atmosphere."  *United States v. Craighead*, 539 F.3d 1073, 1083 (9th Cir. 2008); *see also United States v. Bassignani*, 575 F.3d 879, 885 (9th Cir. 2009).

Here, it is undisputed that Mosqueda telephoned Delacruz and asked if he was willing to come to Child Welfare Services offices for a voluntary interview and he agreed.  (*See* Lodgment No. 1, Rep.'s Tr. vol. 3 at 348, ECF No. 10-3.)  Mosqueda testified she informed Delacruz about the allegations made by J. and M. and questioned him about the claims.  (*Id.*, vol. 2 at 121-22.)  The interview took place in a conference room at the CWS offices, during normal business hours.  (*Id.* at 124; *see also*, vol. 3 at 184.)  There was no law enforcement present and Delacruz was unaware that Detective

Gibbons was even on the premises. (*Id.*, vol. 2 at 123, 134-35.) While Mosqueda did not testify as to how long the interview lasted, Delacruz stated that it lasted only "some ten minutes."[3] (Lodgment No. 1, Rep.'s Tr. vol. 3 at 351.) There is nothing in the record to indicate that Mosqueda applied an inordinate amount of pressure on Delacruz during their meeting. Mosqueda described the interview as "casual." (*Id.* vol. 2 at 125, 135.) She stressed that she told Delacruz he did not have to answer her questions and he could end the interview at any time. (*Id.* at 124-25.) The only individuals present during the interview were Mosqueda and Delacruz. (*Id.*, vol. 2 at 123.) In sum, there is simply nothing in the record to suggest the questioning took place in a "police-dominated atmosphere" such that a reasonable person would not feel free to leave. *See Craighead*, 539 F.3d at 1083.

Delacruz argues he was "in custody" because (1) Moqueda knew that Detective Gibbons planned to arrest him immediately following the interview, regardless of what statements Delacruz gave, (2) he was questioned in a locked room and (3) he was never told he was free to go at any time and (4) Mosqueda was acting as a "de facto police officer." (*See* P. & A. Supp. Traverse at 12-13, ECF No. 13-1.) First, Mosqueda's subjective state of mind is irrelevant. The Supreme Court has held that an officer's "unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer*, 468 U.S. at 442. In *Berkemer*, the Court concluded that the defendant was not "in custody" for *Miranda* purposes even when the interrogating officer reached the decision to arrest a driver at the beginning of the traffic stop, the driver was not "in custody" for purposes of *Miranda* because the officer did not communicate that intent to the driver. *Id.* at 441-42.

/ / /

---

[3] Delacruz did not testify at the pre-trial evidentiary hearing regarding the admissibility of his statements to Mosqueda but he did describe some portions of the interview during his trial testimony. (*See* Lodgment No. 1, vol. 3 at 348-49, 354-57, ECF No. 10-3.).)

Similarly, Detective Gibbons's intention to arrest Delacruz after his interview with Mosqueda was unknown to Delacruz at the time of the interview. (*See* Lodgment No. 1, Rep.'s Tr. vol. 2 at 134-35.) As such, it is not relevant to the custody determination. *Stansbury v. California*, 511 U.S. 318, 323 (1994) (explaining that "the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned"); *Kim*, 292 F.3d at 973 ("The ['in custody'] inquiry focuses on the objective circumstances of the interrogation, not the subjective views of the officers or the individual being questioned.").

Further, the interview took place in a conference room at the offices of Child Welfare Services. That Detective Gibbons was present in another room, unknown to Petitioner, does not render the interrogation "custodial." *See e.g., Mathiason*, 429 U.S. at 495 (a non-custodial interrogation "is not converted to one in which *Miranda* applies" simply because the questioning took place at the police station). Mosqueda testified that she shut and locked the conference room door from the inside to maintain privacy and prevent interruption.[4] Even assuming Delacruz knew the door was locked from the inside, Mosqueda had told Delacruz several times that the interview was voluntary and he could end it at any time. Given all of the surrounding circumstances, Delacruz has failed to establish that a reasonable person would have believed they were not free to terminate the interview. *See e.g.*, *Alvarado*, 541 U.S. at 655-58 (suspect not in custody when suspect's parents brought him to station at detective's request, suspect was interviewed in small room for two hours by one detective, interview was recorded, detective pressed suspect to reveal details of crime by appealing to his "sense of honesty"); *Mathiason*, 429 U.S. at 492-94 (suspect not in custody when suspect contacted police after officer left his card in suspect's apartment with a note asking him to call, suspect was taken to an office

---

[4] There is nothing in the record to indicate whether Delacruz was aware the door was locked during the interview. (*See* Lodgment No. 1, Rep.'s Tr. vol. 2 at 124, 156, ECF No. 10-2.)

with the door closed, interrogating officer advised suspect that police believed he was involved in a burglary)

Lastly, Delacruz's contention that he was in custody because Mosquedo was acting as an agent of law enforcement does not alter the above conclusion. As discussed above, Delacruz was unaware that Detective Gibbons was waiting to arrest Delacruz after the interview was complete. While a social worker could be required to provide *Miranda* warnings under some circumstances, the prerequisites for *Miranda* still must be satisfied: the suspect must be in "custody" and subject to an "interrogation." *See Jackson v. Conway*, 763 F.3d 115, 136-37, 139 (2d Cir. 2014) (noting that non-law-enforcement officials may be required to give *Miranda* warnings prior to questioning only if the person being questioned is in "custody" and the official objectively "should have known" that his questions were "reasonably likely to evoke an incriminating response") (quoting *Innis*, 446 U.S. at 302).

Given these facts, the state court's conclusion that Delacruz was not "in custody" was neither contrary to or an unreasonable application of clearly established federal law. *See* 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 407-08. Accordingly, Delacruz is not entitled to relief on his claim that the admission into evidence at trial of his statements to Mosqueda violated his *Miranda* rights.

### 3. Involuntariness

Delacruz further claims that his statements to Mosqueda were admitted in violation of the Due Process Clause of the Fourteenth Amendment because the interview was involuntary. (Pet. at 5-8, ECF No. 1; *see also* P. & A. Supp. Traverse at 17-19, ECF No. 13-1.) As noted above, the last reasoned opinion to address Delacruz's claim is that of the California Court of Appeal. *See Ylst*, 501 U.S. at 805-06. The appellate court denied the claim, stating:

> Delacruz alternatively contends his admissions to Mosqueda were erroneously admitted into evidence because those statements were made involuntarily. Even assuming this issue is preserved, [footnote 13 omitted] we conclude the statements were not involuntary. A prerequisite to finding

a confession was involuntary under the federal and state Constitutions is that it was the product of some level of coercive activity by law enforcement or some other state actor (*Colorado v. Connelly* (1986) 479 U.S. 157, 166–167, 107 S.Ct. 515, 93 L.Ed.2d 473), such as a confession extracted by threats or violence, or obtained by direct or implied promises, or secured by the exertion of improper influence. (*People v. Benson* (1990) 52 Cal.3d 754, 778, 276 Cal.Rptr. 827, 802 P.2d 330.) Although coercive activity is a necessary predicate to establish an involuntary confession, it "does not itself compel a finding that a resulting confession is involuntary." (*People v. Bradford* (1997) 14 Cal.4th 1005, 1041, 60 Cal.Rptr.2d 225, 929 P.2d 544), because "[t]he statement and the inducement must be causally linked." (*People v. Maury* (2003) 30 Cal.4th 342, 404–405, 133 Cal.Rptr.2d 561, 68 P.3d 1.) Thus, whether a defendant's out-of-court statement resulted from coercive state conduct involves two issues: (1) Did the state actor threaten, promise, or otherwise improperly influence the defendant? (2) If so, did that coercive conduct motivate the defendant to speak? (*People v. Tully* (2012) 54 Cal.4th 952, 986, 145 Cal.Rptr.3d 146, 282 P.3d 173.)

When evaluating whether a confession was involuntary, a court must take into account the "'totality of the circumstances'" surrounding an interrogation, with no single factor being determinative. (*People v. Neal* (2003) 31 Cal.4th 63, 79, 1 Cal.Rptr.3d 650, 72 P.3d 280.) The factors to be considered include "'the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; its continuity' as well as 'the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health.'" (*People v. Williams* (1997) 16 Cal.4th 635, 660, 66 Cal.Rptr.2d 573, 941 P.2d 752, quoting *Withrow v. Williams* (1993) 507 U.S. 680, 693–694, 113 S.Ct. 1745, 123 L.Ed.2d 407.)

Delacruz does not contend there was any evidence that his personal characteristics—his maturity, education, physical condition or mental health—made him susceptible to having his "will . . . overborne" by the circumstances of the interview. (*People v. Memro* (1995) 11 Cal.4th 786, 827, 12 Cal.4th 783, 47 Cal.Rptr.2d 219, 905 P.2d 1305.) Nor was there any evidence the length, location, character or tone of Mosqueda's interview tended to overcome his free will: the interview was relatively short; it was conducted in a benign setting with Delacruz unrestrained; it involved a "casual" and "open-ended" conversation; and it was preceded by assurances he had the right not to answer a question if it made him feel

24

uncomfortable and she would end the interview if he wanted it ended. The sole basis for Delacruz's claim of involuntariness is his assertion that he made the statements to Mosqueda because he hoped doing so would enable him to remain in contact with the family and to move back into the family home. However, there was no evidence Mosqueda made any statements containing an express or implied promised that his cooperation would produce benefits for him. [Footnote 14: omitted.] While Delacruz may have given his statements in the hope he might receive more lenient treatment, that is not without more sufficient to find the statements were involuntary. (See, e.g., *People v. Holloway* (2004) 33 Cal.4th 96, 115, 14 Cal.Rptr.3d 212, 91 P.3d 164 ["'mere advice or exhortation by the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary. . . .Thus, "[w]hen the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct," the subsequent statement will not be considered involuntarily made'"].)

Because there is no evidence Mosqueda made any statements promising that lenient treatment or other benefits would accrue to Delacruz if he confessed, and because none of the other environmental or character factors are present, we reject his claim that his statements to Mosqueda were involuntarily given.

(Lodgment No. 6 at 22-24, ECF No. 10-10.)

Under the Fourteenth Amendment, a confession is involuntary only if the police use coercive means to undermine the suspect's ability to exercise his free will. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986); *Derrick v. Peterson*, 924 F.2d 813, 818 (9th Cir.1990). A court must consider the totality of the circumstances, including factors such as "the surrounding circumstances and the combined effect of the entire course of the officers' conduct," to determine whether the confession was the product of the defendant's free will or whether his will was overborne. *Id.* (citing *United States v. Polanco*, 93 F.3d 555, 560 (9th Cir. 1996)); *Henry v. Kernan*, 197 F.3d 1021, 1026-27 (9th Cir. 1999) (citing *Collazo v. Estelle*, 940 F.2d 411, 416 (9th Cir. 1991) (en banc)).

In determining whether the defendant's will was overborne by the circumstances surrounding a confession, the inquiry "takes into consideration . . . both the

characteristics of the accused and the details of the interrogation." *United States v.*
*Preston*, 751 F.3d 1008, 1016 (9th Cir. 2014) (en banc) (quoting *Dickerson v. United*
*States*, 530 U.S. 428, 434 (2000)).  The question in cases involving psychological
coercion "is whether[, in light of the totality of the circumstances,] the defendant's will
was overborne when the defendant confessed." *United States v. Miller*, 984 F.2d 1028,
1031 (9th Cir. 1993).  More specifically, courts consider the following factors:  the age of
the accused, his intelligence, the lack of any advice to the accused of his constitutional
rights, the length of detention, the repeated and prolonged nature of the questioning, and
the use of physical punishment such as the deprivation of food or sleep.  *United States v.*
*Haswood*, 350 F.3d 1024, 1027 (9th Cir. 2003).

The interrogation techniques of the officer must be "the kind of misbehavior that
so shocks the sensibilities of civilized society as to warrant a federal intrusion into the
criminal processes of the States." *Moran v. Burbine*, 475 U.S. 412, 433-434 (1986).  The
Supreme Court has required a high level of coercion to render a confession involuntary.
*See e.g. Mincey v. Arizona*, 437 U.S. 385 (1978) (finding a confession to be involuntary
where defendant, while hospitalized and sedated in intensive care, was interrogated for
four hours); *Greenwald v. Wisconsin*, 390 U.S. 519 (1968) (finding a confession to be
involuntary where a medicated defendant was questioned for over eighteen hours and was
deprived of food and sleep); *Beecher v. Alabama*, 389 U.S. 35 (1967) (finding a
confession to be involuntary where police officers held a gun to defendant's head).

Habeas relief is not warranted here.  Even presuming for the sake of argument that
Mosquedo was working in concert with Detective Gibbons to obtain inculpatory
statements from Delacruz, the interview techniques used by Mosquedo do not shock the
conscience and the circumstances of the interrogation do not suggest that Delacruz was
coerced or his will overborne.  As discussed above, there is nothing in the record to
suggest that Mosquedo threatened or forced Delacruz to make a statement.  Mosquedo
testified that when she phoned Delacruz to schedule the interview, the conversation was
friendly.  (Lodgment No. 1, vol. 2 at 121-22.)  She told Petitioner over the phone that the

interview was voluntary. (*Id.* at 122; *see also id.*, vol. 3 at 184.) Delacruz agreed to come in the next day. (*Id.* vol. 2 at 122.)

When Delacruz arrived for the interview the following day, Mosquedo informed him again, at the outset, that the interview was voluntary and that he had the right to decline to speak with her if he so chose. (*Id.* at 124.) She told him he was free to decline to answer questions if he was not comfortable doing so and could end the interview at any time. (*Id.* at 125.) Mosquedo also gave Petitioner a pamphlet containing information about his rights. (*Id.* at 131-32.)

There is no evidence that Mosquedo used or threatened to use force to get Delacruz to make a statement, nor is there any indication that Petitioner was hungry or tired during the interview. The interview took place at 2:00 p.m., during normal business hours. (*Id.* at 124; *see also id.*, vol. 3 at 184.) As noted above, while Mosqueda did not testify as to how long the interview lasted, Delacruz testified at trial that the interview lasted only for "some ten minutes." (*Id.* at 351.)

Mosqueda characterized the tone of the interview as "casual." (*Id.*, vol. 2 at 125.) Delacruz does not assert, and the record does not suggest, that his age, education or intelligence made him susceptible to coercion. There is no indication that Mosqueda promised leniency if Delacruz cooperated or punishment if he did not. There was no one else in the interview room and Delacruz was unrestrained. Although the door to the conference room was closed and locked, Mosqudeo testified that it was her standard practice to lock the door from the inside to ensure the interview was private and uninterrupted. (*Id.* at 124-25.)

Petitioner argues that he only agreed to the interview because he felt that his access to his children would be affected by the results of the interview. He contends that he "thought he was talking to a social worker, but he was actually talking to a police agent who was merely extracting a confession for the police before petitioner was arrested. And petitioner believed that talking with Mosqueda was the only alternative he had to be able to see the children again." (P. & A. Supp. Traverse at 19, ECF No. 13-1.) Delacruz

points to *Lynumm v. Illinois*, 372 U.S. 528 (1963) for support. There, the Court held that "the petitioner's oral confession was made only after the police had told her that state financial aid for her infant children would be cut off, and her children taken from her, if she did not 'cooperate.'" *Id.* at 534. The Court held "that a confession made under such circumstances must be deemed not voluntary, but coerced." *Id.*

Delacruz's reliance on *Lynumm* is misplaced. First, deception alone is insufficient to render a statement involuntary. *See Pollard v. Galaza*, 290 F.3d 1030, 1034 (9th Cir. 2002); *Ortiz v. Uribe*, 671 F.3d 863, 868 (9th Cir. 2011) ("deception alone" will not render confession involuntary); *United States v. Crawford*, 372 F.3d 1048, 1060-61 (9th Cir. 2004) ("Trickery, deceit, even impersonation do not render a confession inadmissible, certainly in noncustodial situations and usually in custodial ones as well, unless government agents make threats or promises.").

Furthermore, there is nothing in the record to suggest that Mosqueda told Delacruz that he would lose his stepchildren unless he cooperated. Prior to the interview, Petitioner had voluntarily moved out of the home while the allegations were investigated. (Lodgment No. 1, Rep.'s Tr. vol. 2 at 122, 129-30, ECF No. 10-2.) While Mosqueda testified that she believed Delacruz was aware that the interview could impact his ability to see his stepdaughters, there is nothing in the record to suggest she made any promises or threats. (*See id.* at 132.) Unlike the petitioner in *Lynumm*, Delacruz was not told that his ability to see his stepchildren would be in further jeopardy if he failed to cooperate. Any perceived threat to his ability to see his stepchildren stemmed from the allegations of abuse, not his willingness to cooperate. This does not amount to coercion. *See United States v. Haswood*, 350 F.3d 1024, 1029 (9th Cir. 2003) (concluding it was not coercive to recite potential penalties or sentences); *see also Amaya-Ruiz v. Stewart*, 121 F.3d 486, 494 (9th Cir. 1997) (overruled on other grounds by *United States v. Preston*, 751 F.3d 1008, 1020 (9th Cir. 2014) (stating that encouraging a suspect to tell the truth is not coercive); *see also Ortiz*, 671 F.3d at 872.

/ / /

Further, nothing in Delacruz's testimony suggests Mosqueda was overly aggressive or confrontational. She did not yell, threaten or force Petitioner to make a statement. Delacruz described Mosqueda only as "very serious" and "acting like a person in authority." (Lodgment No. 1 vol. 3 at 349, ECF No. 10-3.) He admitted that he and Mosqueda never "[got] into a fight" during the meeting but stated that, at one point, "maybe she became kind of grouchy." (*Id.* at 356.) This is a far cry from the kind of conduct the Supreme Court has held constitutes coercion such that it "shocks the sensibilities of civilized society." *See Moran*, 475 U.S. at 433-34. Accordingly, the California Court of Appeal's denial of Petitioner's due process claim was neither contrary to, nor an unreasonable application of clearly established law. *Williams*, 529 U.S. at 407-08.

### 4. Conclusion

In sum, for the reasons discussed above, Delacruz has failed to establish that his statements to Mosqueda were admitted in violation of his *Miranda* rights because he was not in custody at the time. Moreover, the interview was not involuntary under the Due Process Clause. As such, the state court's denial of the claims was neither contrary to, nor an unreasonable application of, clearly established law. *See* 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 407-08. Claim one is therefore **DENIED.**

## B. Expert Testimony

In ground two, Delacruz argues that testimony from an expert witness for the prosecution was admitted in violation of his Sixth Amendment right to confront witnesses against him. (*See* Pet. at, ECF No. 1; *see* also Mem. P. & A. Supp. Traverse at 21-24, ECF No. 13-1.) Respondent argues that Petitioner is not entitled to relief because the state court's denial of the claim was neither contrary to, nor an unreasonable application of, clearly established law. (Mem. P. & A. Supp. Answer at 32-35, ECF No. 8-1.) Further, Respondent contends that even presuming error, it was harmless. (*Id.* at 35-37.)

/ / /

/ / /

*1.*     *State Court Decision*

Delacruz raised this claim in his petition for review to the California Supreme Court, which was denied without comment or citation. (*See* Lodgment Nos. 7 & 8, ECF Nos. 10-11, 10-12.) This Court therefore looks through the silent denial to the California Court of Appeal's reasoned decision. *See Ylst*, 501 U.S. at 805-06. In denying the claim, the appellate court stated:

> Delacruz contends the court erred under *People v. Sanchez* (2016) 63 Cal.4th 665, 204 Cal.Rptr.3d 102, 374 P.3d 320 (*Sanchez*) when it allowed testimony from an expert witness about the contents of a study on which the expert relied to explain the frequency of (and causal forces connected to) recantation by children of accusations of molestation.

> 1.  Procedural Background

> Catherine McLennan testified as an expert about, among other topics, the myths and misconceptions regarding the disclosure and non-disclosure of child abuse. McLennan testified people are surprised to learn that, most often, victims fail to disclose but if they do disclose its often delayed, and she described studies addressing this phenomenon. Disclosure is more likely if the perpetrator is a stranger to the victim. If the two have a close relationship, immediate disclosure is rare. McLennan also explained how an unsupportive parent can hinder disclosure from the child. McLennan also explained why apparently inconsistent versions of events given by a child can be attributable to their age and other factors. [Footnote 15: McLennan explained very young children have trouble with sequencing events and, when asked what happened, may begin the story at the end. When the abuse is repeated, the child may not be able to remember exactly how many times it occurred. It may also be difficult for a child to give consistent versions about what happened, and the description will depend upon who is asking a question and how it is asked. Sometimes what appears to be an inconsistency is merely the child providing additional information via "incremental disclosure," which refers to gradual or partial disclosure, and it is common for the child to give additional details as the investigation goes along. This occurs because the interview techniques have changed, or the child initially withholds information, or the child remembers more as time goes on.]

/ / /

McLennan also testified about recantation (meaning the child takes back the disclosure) and minimization (where the child withdraws a portion of the allegation). The latter occurs by the child admitting something happened but not as much or as frequently as previously asserted. McLennan stated literature and research make clear that, once they disclose sexual abuse, most children do not recant their allegations. However, McLennan described, over defense objection, a recent study by Dr. Tom Lyon of children in Los Angeles County dependency hearings which indicated 23 percent of children did recant. [Footnote 16: McLennan also testified, over defense objection, to Dr. Lyon's background and expertise. She indicated Lyon is a lawyer and a psychologist based out of University of Southern California and had done a tremendous amount of work, research, and writing in the area of child abuse. Dr. Lyon was heavily relied upon by experts in the field, ". . . particularly on the West Coast."] The most common reason was internal pressure from family members or from other adults.

## 2. Reference to the Lyon Study Was Not Improper

In *Sanchez*, the California Supreme Court addressed two issues regarding the extent to which an expert could consider and rely on hearsay in his testimony to a jury. First, it grappled with the interplay between the traditional rules permitting experts to rely on hearsay in forming their opinions (*Sanchez*, supra, 63 Cal.4th at pp. 675–676, 204 Cal.Rptr.3d 102, 374 P.3d 320) and the limitations placed on hearsay evidence in criminal trials by the Confrontation Clause as construed by *Crawford v. Washington* (2004) 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (*Crawford*) and its progeny. (*Sanchez*, at pp. 679–684, 204 Cal.Rptr.3d 102, 374 P.3d 320.) Second, the court's opinion sought to "clarify the proper application of Evidence Code sections 801 and 802 relating to the scope of expert testimony." (*Id.* at 670, 204 Cal.Rptr.3d 102, 374 P.3d 320.)

*Sanchez* recognized that under *Crawford*, absent an exception recognized at the time of the Sixth Amendment's adoption (see *Crawford*, supra, 541 U.S. at p. 56, fn. 6, 124 S.Ct. 1354), admission of what *Crawford* labeled as "testimonial hearsay" against a criminal defendant will violate the confrontation clause "unless (1) the declarant is unavailable to testify and (2) the defendant had a previous opportunity to cross-examine the witness or forfeited the right by his own wrongdoing." (*Sanchez*, supra, 63 Cal.4th at p. 680, 204 Cal.Rptr.3d 102, 374 P.3d 320.) However, *Sanchez* also acknowledged that admission of hearsay violates

the Confrontation Clause only if "the statement is testimonial hearsay, as the high court defines that term." (*Ibid.*)

While the precise parameters of what types of hearsay will constitute impermissible "testimonial" hearsay may be imprecise (see *Crawford*, supra, 541 U.S. at p. 68, 124 S.Ct. 1354 ["We leave for another day any effort to spell out a comprehensive definition of 'testimonial'"]; *People v. Dungo* (2012) 55 Cal.4th 608, 619, 147 Cal.Rptr.3d 527, 286 P.3d 442 [noting "the high court has not agreed on a definition of 'testimonial'"]), it appears that "testimonial out-of-court statements have two critical components. First, to be testimonial the statement must be made with some degree of formality or solemnity. Second, the statement is testimonial only if its primary purpose pertains in some fashion to a criminal prosecution." (*Ibid.*) In *Ohio v. Clark* (2015) — U.S. —, [135 S.Ct. 2173], 192 L.Ed.2d 306 (*Clark*), the Court explained its decisions had "never suggested . . . that the Confrontation Clause bars the introduction of all out-of-court statements that support the prosecution's case. Instead, we ask whether a statement was given with the 'primary purpose of creating an out-of-court substitute for trial testimony.'" (*Id.* at p. 2183.)

*Sanchez* recognized that some types of hearsay upon which an expert might rely do trigger Confrontation Clause concerns under *Crawford* and extensively examined what types of hearsay may transgress *Crawford* and its progeny. (*Sanchez*, supra, 63 Cal.4th at pp. 680–684, 204 Cal.Rptr.3d 102, 374 P.3d 320.) But *Sanchez* also cautioned it was not "call[ing] into question the propriety of an expert's testimony concerning background information regarding his knowledge and expertise and premises generally accepted in his field. Indeed, an expert's background knowledge and experience is what distinguishes him from a lay witness, and, as noted, testimony relating such background information has never been subject to exclusion as hearsay, even though offered for its truth. Thus, our decision does not affect the traditional latitude granted to experts to describe background information and knowledge in the area of his expertise." (*Id.* at p. 685, 204 Cal.Rptr.3d 102, 374 P.3d 320.)

Indeed, *Sanchez* specifically noted an expert may "rely on hearsay in forming an opinion, and may tell the jury in general terms that he did so. Because the jury must independently evaluate the probative value of an expert's testimony, Evidence Code section 802 properly allows an expert to relate generally the kind and source of the 'matter' upon which his opinion rests. A jury may repose greater confidence in an expert who relies upon

well-established scientific principles.  It may accord less weight to the views of an expert who relies on a single article from an obscure journal or on a lone experiment whose results cannot be replicated.  There is a distinction to be made between allowing an expert to describe the type or source of the matter relied upon as opposed to presenting, as fact, case-specific hearsay that does not otherwise fall under a statutory exception." (*Sanchez*, supra, at pp. 685–686, 204 Cal.Rptr.3d 102, 374 P.3d 320.)

We are convinced the trial court correctly overruled Delacruz's objections because the objected-to statements of the expert here did not relate testimonial case-specific hearsay within the rationales of governing jurisprudence.  *Sanchez* presupposes that an expert can refer generally to studies in the relevant field that provide background support for an opinion being offered because such studies are neither case specific nor testimonial. Here, for example, there is no indication that Dr. Lyon's research was performed in anticipation of any prosecution, much less the present prosecution, nor is there any suggestion the study was intended as a substitute for trial testimony.  [Footnote 17 omitted.]  To the contrary, on this record it appears the study was done purely for research purposes. Accordingly, the results of the study do not qualify as testimonial hearsay within the rationale of *Crawford* and its progeny.  [Footnote 18:  Although we are unaware of any California authority evaluating the propriety under *Crawford* of an expert's reliance on statistical data in forming his or her opinion, at least one federal court appears to have concluded such information is not testimonial in violation of *Crawford* because "[t]hey are not formalized testimonial materials; nor are they statements made primarily for accusing a specific individual at trial."  (*United States v. Pritchard* (C.D. Cal. 2014) 993 F.Supp.2d 1203, 1213 [databases relied on to perform statistical analysis of defendants' DNA samples not "testimonial"].)]

We are equally convinced the objected-to statements of the expert here did not relate case-specific hearsay within the ambit of *Sanchez*. *Sanchez* described "case-specific facts" as "those relating to the particular events and participants alleged to have been involved in the case being tried." (*Sanchez*, supra, 63 Cal.4th at p. 676, 204 Cal.Rptr.3d 102, 374 P.3d 320.)  *Sanchez*, illustrating the distinction between case-specific facts and background information, noted for example that ". . .15 feet of skid marks were measured at an auto accident scene would be case-specific information.  Those facts could be established, for example, through the testimony of a person who measured the marks.  How automobile skid

marks are left on pavement and the fact that a given equation can be used to estimate speed based on those marks would be background information an expert could provide." (*Id*. at p. 677, 204 Cal.Rptr.3d 102, 374 P.3d 320.)

Applying the *Sanchez* approach here, we are convinced the expert's discussion about Dr. Lyon's study did not transgress traditional hearsay limitations on an expert's testimony. Although Dr. Lyon's results may have been premised on his interviews with the subjects of his study, those interviews were unrelated to Delacruz's case and did not concern a fact or circumstance underlying Delacruz's crimes. Instead, the Lyon study was merely part of the general body of knowledge which contributed to McLennan's area of expertise. (See *Sanchez*, supra, 63 Cal.4th at p. 676, 204 Cal.Rptr.3d 102, 374 P.3d 320 ["[A]n expert's testimony concerning his general knowledge, even if technically hearsay, has not been subject to exclusion on hearsay grounds."].) Indeed, McLennan's testimony specifically eschewed any claim she was relating case-specific knowledge, because she testified she knew nothing about Delacruz's case. [Footnote 19: McLennan testified she had not been given any discovery, had not seen any reports, had not watched the forensic interviews, had never met the victims, was unaware of the specific allegations against Delacruz, and that her testimony was solely based on her education and 30 years of experience.]

Accordingly, we conclude the trial court correctly overruled Delacruz's hearsay objection to McLennan's testimony concerning the Lyon study.

(Lodgment No. 6 at 24-30, ECF No. 10-10.)

### 2. Discussion

The Sixth Amendment to the United States Constitution grants a criminal defendant the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. "The 'main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination.'" *Fenenbock v. Dir of Corr. for Cal.*, 692 F.3d 910, 919 (9th Cir. 2012) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986)).

/ / /

In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court held that the Confrontation Clause bars the state from introducing into evidence out-of-court statements which are "testimonial" in nature unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness, regardless of whether such statements are deemed reliable. Thus, it is clearly established that "[w]here testimonial evidence is at issue, . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Id.* at 68. The *Crawford* rule "has no application to" an "out-of-court nontestimonial statement." *Id.* at 42, 51, 68; *see also Whorton v. Bockting*, 549 U.S. 406, 420 (2007).

Although the Court in *Crawford* did not expressly define what constitutes "testimonial," it gave three examples of the "core class of 'testimonial' statements": (1) ex parte in-court testimony or its functional equivalent, such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; (2) extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; and (3) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Crawford*, 541 U.S. at 51-52.

The "primary purpose" test establishes the boundaries of testimonial evidence. Statements are testimonial: (1) "when they result from questioning, 'the primary purpose of [which was] to establish or prove past events potentially relevant to later criminal prosecution,' *Davis v. Washington*, 547 U.S. 813, 822 (2006)," and (2) "when written statements are 'functionally identical to live, in-court testimony,' 'made for the purpose of establishing or proving some fact' at trial, *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 310-11 (2009)." *Lucero v. Holland*, 902 F.3d 979, 989 (9th Cir. 2018) (alteration in original) (citing *Ohio v. Clark*, – U.S. –, 135 S. Ct. 2173, 2179 (2015)).

When the primary purpose of taking an out-of-court statement is to create an out-of-court substitute for trial testimony, the statement is testimonial hearsay and *Crawford*

applies. *Michigan v. Bryant*, 562 U.S. 344, 358 (2011). When that was not the primary purpose, "the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause." *Id.* The primary purpose of a statement is determined objectively. *United States v. Rojas-Pedroza*, 716 F.3d 1253, 1267 (9th Cir. 2013). Thus "'the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred.'" *Id.* (quoting *Bryant*, 562 U.S. at 360). The testimonial intent of the speaker must be evaluated in context, and part of that context is the questioner's identity. *Lucero*, 902 F.3d at 990 n.5.

Here, Catherine McLennen, a forensic health supervisor in the child abuse department at Palomar Health, testified as to her expert opinion on common patterns seen in child sexual abuse cases and how young victims disclose (or do not disclose) the abuse. McLennen testified that there are several prevalent myths about disclosure of child sexual abuse. (*See* Lodgment No. 1, Rep.'s Tr. vol. 3 at 272-75, 288-305.) For example, she stated, people are often surprised to learn that most often, children fail to disclose; and even when a child does disclose abuse, there is often a significant delay between the abuse and the disclosure. (*Id.* at 272-73.)

McLennen testified that she was familiar with several studies on reporting of child abuse and that those studies have shown that as many as two-thirds of child victims never disclose at all. (*Id.* at 273.) She stated that among the reasons children fail to disclose are shame, embarrassment and fear of negative consequences, such as not being believed or causing the perpetrator to be removed from the household. In addition, several factors can affect a child's decision to disclose, including the child's age (as the child gets older and understands the perpetrator did something wrong), his or her concern for younger siblings, the child's abuser leaves the home, or the child's distress gets so high he or she feels compelled to finally report the abuse. (*Id.* at 289-91.)

/ / /

McLennen then went on to testify about recantation in child abuse cases and the following exchange occurred:

> [Prosecutor]: And what factors, based on your training and experience and research, would go into a child then minimizing or recanting that earlier statement about abuse.

> [McLennen]: Well, most children don't recant. And that's clear in the literature and the research. The last piece of research that I am familiar with was Dr. Tom Lyon at [University of Southern California] did a study on some children who were --

> [Defense Counsel]: I'm going to object at this point, your honor.

> [McLennen]: -- in dependency court.

> [The Court]: One moment, please. What's the basis of the objection?

> [Defense Counsel]: Well, as an expert, this would be for redirect or upon cross-examination, but there hasn't been a cross-examination yet. So right now it's hearsay.

> [The Court]: Overruled. You may continue.

> [Witness]: Did a study out of children in dependency hearings in Los Angeles. And he had a recantation rate of those children in 20 – I think it was 23 percent of children took it back in that setting. And the most important or significant factor in influencing a child in that regard was internal pressure from family or adults to take it back, take their recantation or take their assertion back.

> [Prosecutor]: Now, just so we understand, you just mentioned somebody by the name of Tom Lyon. Can you briefly tell us who Tom Lyon is and how he relates to the field of child abuse so we can get a sense of why his research matters in this field?

> [Defense Counsel]: Objections. Again, request a sidebar.

> [The Court]: No. Overruled. I think it is appropriate. Basis of opinion.

[McLennen]:  He is both a lawyer and psychologist by training.  He works out of USC and law school.  And he has done a tremendous amount of work, research, writing in the area of child abuse a number of ways.

And when the California Protocol was developed that is, the sort of best practice protocol that forensic interviewers in California are supposed to stick with, they based it largely on the work of Dr. Tom Lyon who developed something called the ten-step investigative interview.  He has multiple, multiple works out on child abuse and not necessarily only child abuse, but primarily.

[Prosecutor]:  Is he heavily relied upon in your field?

[McLennen]:  Yes, particularly on the west coast.

(Lodgment No. 1, Rep.'s Tr. vol. 3 at 304-05, ECF No. 10-3.)

McLennen's reference to Dr. Lyon's research was does not implicate the Confrontation Clause because it was not "testimonial."  The "primary purpose" of the Lyon's study was not to "create an out-of-court substitute for trial testimony."  *See Bryant*, 562 U.S. at 358.  As McLennen testified, Dr. Lyon is an academic who conducts research which is then used to create protocols for other experts and practitioners who work with child abuse victims.  (Lodgment No. 1, Rep.'s Tr. vol. 3 at 305, ECF No. 10-3.)  McLennen stated that Lyon's research and studies on child abuse were used to inform her own expertise.  (*See id.* at 304.)  She noted that Dr. Lyon's research is relied upon by many experts and practitioners in the field and has been used to develop standard protocols for forensic interviewers in California.  (*Id.* at 304-05.)

There was no reasonable expectation that the study McLennen referenced was prepared by Dr. Lyon to be used "prosecutorially."  *See Crawford*, 541 U.S. at 51.  Nor is it like the other formalized testimonial materials, such as depositions and affidavits, discussed in *Crawford.  See id.*  Lastly, nothing about Dr. Lyon's study suggests that that it would be later be used at Delacruz's criminal prosecution.  *See Crawford*, 541 U.S. at 51-52.  Rather, under the circumstances, a reasonable person would conclude the primary purpose of the study was not to be presented as evidence at Delcruz's trial, but to help

38

develop a better understanding of child reporting of sexual abuse and improve interview protocols for other experts in the field. As such, McLennen's reference to Dr. Lyon's study on recantation rates among child abuse victims was not "testimonial." *See Rojas-Pedroza*, 716 F.3d at 1268 (concluding that when a record is made under circumstances objectively indicating that the primary purpose is non-testimonial, the ordinary contents of the record are also non-testimonial).

Furthermore, even assuming it was testimonial in nature, the reference to Dr. Lyon's data on recantation was not offered for its truth; rather, it was presented as a basis for McLennen's opinion in general. The Confrontation Clause "has no application to out-of-court statements that are not offered to prove the truth of the matter asserted." *Williams v. Illinois*, 567 U.S. 50, 57-58 (2012); *see also Crawford*, 541 U.S. at 59 n.9 (noting that the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted"). As the Supreme Court has explained:

> When an expert testifies for the prosecution in a criminal case, the defendant has the opportunity to cross-examine the expert about any statements that are offered for their truth. Out-of-court statements that are related by the expert solely for the purpose of explaining the assumptions on which that opinion rests are not offered for their truth and thus fall outside the scope of the Confrontation Clause.

*Williams*, 567 U.S. at 58. "Under settled evidence law, an expert may express an opinion that is based on facts that the expert assumes, but does not know, to be true." *Id.* at 57. Here, McLennen testified that her opinion was based on her education, research and experience in the field. (Lodgment No. 1, Rep.'s Tr. vol. 3 at 306.) This included her study of Dr. Lyon's research. (*Id.*) Taken in context, McLennen's testimony about recantation rates found in Dr. Lyon's study was not offered for its truth but as an example of the kind of research upon which her own opinion on recantation was based. Thus, the Confrontation Clause was not implicated.

/ / /

Finally, even assuming McLennan's testimony regarding Dr. Lyon's study was testimonial and erroneously admitted under *Crawford*, Delacruz would not be entitled to habeas relief because he has failed to establish it had a substantial and injurious effect on the jury's verdict. Where testimonial statements have been admitted in violation of the Confrontation Clause, the error is subject to harmless error analysis. *Ocampo v. Vail*, 649 F.3d 1098, 1114 (9th Cir. 2011) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)); *see also Winzer v. Hall*, 494 F.3d 1192, 1201 (9th Cir. 2007). "If the error did not result in 'actual prejudice,' the [federal habeas] writ should not issue." *Winzer*, 494 F.3d at 1201 (quoting *Brecht*, 507 U.S. at 638). "'Actual prejudice' is demonstrated if the error in question had a 'substantial and injurious effect or influence in determining the jury's verdict.'" *Id*.

Petitioner admitted that he had touched J. and M. on the vagina under their clothes but testified that he lacked the requisite sexual intent. (Lodgment No. 1, Rep.'s Tr. vol. 4 at 340-42.) He claimed he only touched the girls in order to demonstrate inappropriate touching and ask if anyone had ever touched them like that. (*See id.* at 342.) To satisfy the intent element under California Penal Code section 288(a), the prosecution must establish that the defendant had "the specific intent of arousing, appealing to, or gratifying the lust of the child or the accused." *People v. Warner*, 39 Cal. 4th 548, 557 (Cal. 2006). "Because intent for purposes of . . . section 288 can seldom be proven by direct evidence, it may be inferred from the circumstances." *In re Mariah T*., 159 Cal. App. 4th 428, 440 (Cal. App. 2008). Where the "defendant's physical conduct might be consistent with a nonsexual purpose, the jury can look to surrounding circumstances and rely on them to draw inferences about his intent." *People v. Valenti*, 243 Cal. App. 4th 1140, 1160 (Cal. App. 2016). Relevant factors can include a defendant's "extrajudicial statements, other acts of lewd conduct admitted or charged in the case, the relationship of the parties, and any coercion, bribery, or deceit used to obtain the victim's cooperation or to avoid detection." *People v. Martinez*, 11 Cal. 4th 434, 445 (Cal. 1995). (internal citations omitted).

Here, the evidence of sexual intent was strong, despite Delacruz's testimony to the contrary. The jury heard testimony from Mosqueda, who had interviewed both victims. J. told Mosqueda that Delacruz had touched her vagina over and under her clothing. She stated that the touching made her uncomfortable and she did not like it. Sometimes Delacruz kissed her on the mouth. She told Mosqueda that the incidents started when she was about six years old and had had occurred on numerous occasions. (*See* Lodgment No. 1, Rep.'s Tr. vol. 3 at 170-73.) J. told Mosqueda that the last time it occurred was about a week before their interview. (Lodgment No., Rep.'s Tr. vol. 3 at 168.) M. also told Mosqueda that Delacruz touched her vagina under her clothing on one or two occasions. (*Id.* at 183.)

The jury also saw video recording of the interviews of J. and M. conducted by Marison Olguin, a forensic interviewer at Rady Children's Hospital. (*See id.* at 227, 258-59; *see also* Lodgment No. 2., Clerk's Tr. vol. 2 at 4-62.) During her interview, J. told Olguin that Petitioner "did stuff I didn't like." (Lodgment No. 2., Clerk's Tr. vol. 2 at 13.) J. reported that Delacruz had touched her vagina on several occasions, at two different residences. (*Id.* at 16, 27, 32.) She stated that, although she did not remember exactly when Delacruz touched her the first time, it occurred when she was "like, seven or six" years old. (*Id*. at 16-17, 26.) When asked how she felt when Delacruz touched her vagina under her clothing, J. stated it made her feel "bad." (*Id.* at 22.) She told Olguin, "And now being he's no longer there, I, I feel better because he's not doing it to me anymore." (*Id.* at 19.)

J. said Delacruz told her not to tell her mother or Delacruz and her mother would have to separate. (*Id.* at 33.) J. explained that she told her mother once about the touching and that the incidents stopped for a period of time but resumed again. (*Id.* at 35.) After it started again, J. finally told her grandmother. (*Id.* at 33-34.) J. told Olguin that she did not tell her mother again because she thought if she did so, Delacruz and her mother would separate. (*Id*.) Not long after J. told her grandmother, Delacruz left the home. J. stated "[W]ell they've now separated and I now feel more comfortable at the

house that he now doesn't, he doesn't do that to me anymore." (*Id.* at 33.) The number and nature of incidents of vaginal touching reported by J. and M., along with Delacruz's attempts to prevent J. from reporting the touching provided strong evidence of "sexual intent." *See Martinez*, 11 Cal. 4th at 445.

Given the strong evidence against Delacruz, McLennan's testimony, even assuming it was improper, did not have a substantial injurious effect on the jury's verdict. As discussed above, McLennen testified only generally about the disclosure and non-disclosure of sexual abuse by child victims. She had no prior knowledge of the specific facts of Delacruz's case. She never met the victims, did not review statements of the victims or witnesses, or any other evidence. She had no knowledge of the specific allegations. (Lodgment No. 1, vol. 3 at 306-07, ECF No. 10-3.) Her testimony was presented to give jurors a general understanding of some of the unique issues that arise in the context of child molestation disclosures. McLennan's brief testimony about Dr. Lyon's study on recantation did nothing to directly undermine Delacruz's defense. Thus, Petitioner cannot establish that any alleged error in admitting the testimony had a substantial or injurious effect on the jury's verdict. *See Brecht*, 507 U.S. at 638.

For the reasons discussed above, McLennen's testimony regarding Dr. Lyon's research was not testimonial and not offered for its truth. As such, the state court's denial of Delacruz's Confrontation Clause claim was neither contrary to, nor an unreasonable application of, clearly established law. *See* 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 407-08. Moreover, even assuming there was constitutional error, Delacruz has not established prejudice. *See Brecht*, 507 U.S. at 638. Accordingly, claim two is **DENIED**.

## VI. CERTIFICATE OF APPEALABILITY

A petitioner complaining of detention arising from state court proceedings must obtain a certificate of appealability to file an appeal of the final order in a federal habeas proceeding. 28 U.S.C. § 2253(c)(1)(A) (2007). The district court may issue a certificate of appealability if the petitioner "has made a substantial showing of the denial of a constitutional right." Id. § 2253(c)(2). To make a "substantial showing," the petitioner

must "demonstrat[e] that 'reasonable jurists would find the district court's assessment of the constitutional claims debatable[.]' " *Beaty v. Stewart*, 303 F.3d 975, 984 (9th Cir.2002) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). Petitioner has not made a "substantial showing" as to any of the claims raised by his petition, and thus the Court *sua sponte* **DENIES** a certificate of appealability.

## VII. CONCLUSION

Based on the foregoing, the Court **DENIES** the petition for writ of habeas corpus and **DENIES** a certificate of appealability as to all claims.

**IT IS SO ORDERED.**

Dated: August 19, 2019

_____
Hon. Cathy Ann Bencivengo
United States District Judge